IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| SUNFLOWER REDEVELOPMENT, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:15-CV-00577-DGK |
| | ) | |
| ILLINOIS UNION INSURANCE CO., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT

This case arises out of an insurance dispute. After insurer Defendant Illinois Union Insurance Co. ("ILU") refused to indemnify Plaintiff Sunflower Redevelopment, LLC ("Sunflower"), Sunflower sued for declaratory judgment and breach of contract.

At the parties' request, the Court agreed to separate the litigation of this case into two phases (Doc. 29). Phase I, which is the basis for the pending motions, pertains to the issue of whether pollution conditions within certain Solid Waste Management Units ("SWMU") and Areas of Concern ("AOC") are excluded from coverage under a Premise Pollution Liability ("PPL") insurance policy. The parties agree the insurance policies at issue are unambiguous (Doc. 51).

Now before the Court are the parties' cross-motions for partial summary judgment on the Phase I issue (Docs. 55[1] & 57). For the reasons set forth below, the Court GRANTS IN PART and DENIES IN PART Plaintiff's motion (Doc. 57), and GRANTS IN PART and DENIES IN PART Defendant's motion (Doc. 55).

---

[1] ILU requests oral argument on its motion for partial summary judgment. Because the Court has determined oral argument would not be helpful in resolving the issues, ILU's request for oral argument is denied. ILU's motion has been decided on the parties' written memoranda.

## Undisputed Material Facts[2]

At the heart of this dispute is the former Sunflower Army Ammunition Plant ("Plant"), consisting of approximately 9,035 acres in Johnson County, Kansas. The Army manufactured power and propellant munitions, and nitric and sulfuric acids at the Plant. During its operation, spills and releases of propellant, heavy metals, nitrate compounds, and other pollutants contaminated various parts of the Plant property. Due to these activities, numerous areas of the property were determined to be heavily polluted.

In 1998, the Army determined it no longer needed the Plant. Sunflower sought to purchase the property with a vision to clean up the pollutants and develop the land.

Prior to the sale, on July 29, 2005, the Kansas Department of Health and Environment ("KDHE") issued a Consent Order obligating Sunflower to remediate all pollution conditions at the Plant before Sunflower could develop the property. The Consent Order also required Sunflower to purchase PPL and Remediation Cost Containment ("RCC") insurance.

On August 3, 2005, Sunflower entered into an agreement with the Army to purchase the Plant. The conveyance was made subject to the pollution conditions. On the same day, Sunflower entered into a Remediation Services Agreement ("RSA") with the United States, which obligated Sunflower to purchase environmental insurance, secure the worksite, and perform certain remediation work. In exchange, the Army would pay Sunflower for the outlined remediation work. The Army and Sunflower codified the specific remediation work covered by the RSA into the "Remediation Plan." The work described in the Remediation Plan is organized by SWMUs and AOCs, which represent defined geographical areas of the Plant property.

---

[2] The Court excluded asserted facts that were immaterial to the resolution of the pending motion, asserted facts that were not properly supported by admissible evidence, legal conclusions, and argument presented as an assertion of fact. Additionally, ILU asks the Court to strike paragraphs 4, 5, 27, 41, 49, 51, and 52-61 of Sunflower's Concise Statement of Uncontroverted Facts (Doc. 60 at 9-10). The Court finds these facts are not material to the resolution of this dispute, and therefore denies the request to strike.

ILU issued Sunflower PPL insurance providing coverage for unknown, and certain known, pre-existing pollution conditions at the Plant. Relevant to this dispute, Endorsement 001 of the PPL policy excludes coverage for "'remediation costs' . . . with respect to those 'pollution conditions' . . . related to the implementation and management of the 'remediation plan' identified within [the] Remediation Plan Schedule endorsement of the [RCC policy]." PPL policy at 15 (Doc. 58-5).

ILU also issued Sunflower an RCC policy, which "affords coverage for costs in excess of a remediation plan incurred during the policy period." RCC policy at 2 (Doc. 58-6). Under the RCC policy, Sunflower is entitled to "'excess remediation costs' [that] arise out of 'Pollution Conditions' identified in the 'remediation plan' or are first discovered during the implementation of the 'remediation plan.'" RCC policy at 5.

On December 19, 2008, during the period of coverage, KDHE ordered Sunflower to investigate and remediate contaminated soils at the Plant (Doc. 58-7). These pollution conditions exist both inside and outside of existing SWMUs and AOCs. Also, these pollution conditions are not specifically listed in the RSA or the Remediation Plan. KDHE told Sunflower it was liable for remediation costs associated with these pollution conditions at the Plant.

On February 13, 2009, Sunflower submitted a claim to ILU under the RCC policy, but ILU did not immediately cover the claim. Instead, on April 9, 2009, ILU pointed Sunflower to the RCC policy terms that require Sunflower to submit a revised remediation plan to ILU for approval before Sunflower could file a claim under the RCC policy. *See* RCC policy at 10. Sunflower interpreted this response as a coverage denial and then submitted a claim under the PPL policy. On May 21, 2010, ILU denied coverage under the PPL policy because "the work

ILU issued Sunflower PPL insurance providing coverage for unknown, and certain known, pre-existing pollution conditions at the Plant. Relevant to this dispute, Endorsement 001 of the PPL policy excludes coverage for "'remediation costs' . . . with respect to those 'pollution conditions' . . . related to the implementation and management of the 'remediation plan' identified within [the] Remediation Plan Schedule endorsement of the [RCC policy]." PPL policy at 15 (Doc. 58-5).

ILU also issued Sunflower an RCC policy, which "affords coverage for costs in excess of a remediation plan incurred during the policy period." RCC policy at 2 (Doc. 58-6). Under the RCC policy, Sunflower is entitled to "'excess remediation costs' [that] arise out of 'Pollution Conditions' identified in the 'remediation plan' or are first discovered during the implementation of the 'remediation plan.'" RCC policy at 5.

On December 19, 2008, during the period of coverage, KDHE ordered Sunflower to investigate and remediate contaminated soils at the Plant (Doc. 58-7). These pollution conditions exist both inside and outside of existing SWMUs and AOCs. Also, these pollution conditions are not specifically listed in the RSA or the Remediation Plan. KDHE told Sunflower it was liable for remediation costs associated with these pollution conditions at the Plant.

On February 13, 2009, Sunflower submitted a claim to ILU under the RCC policy, but ILU did not immediately cover the claim. Instead, on April 9, 2009, ILU pointed Sunflower to the RCC policy terms that require Sunflower to submit a revised remediation plan to ILU for approval before Sunflower could file a claim under the RCC policy. *See* RCC policy at 10. Sunflower interpreted this response as a coverage denial and then submitted a claim under the PPL policy. On May 21, 2010, ILU denied coverage under the PPL policy because "the work

ILU issued Sunflower PPL insurance providing coverage for unknown, and certain known, pre-existing pollution conditions at the Plant. Relevant to this dispute, Endorsement 001 of the PPL policy excludes coverage for "'remediation costs' . . . with respect to those 'pollution conditions' . . . related to the implementation and management of the 'remediation plan' identified within [the] Remediation Plan Schedule endorsement of the [RCC policy]." PPL policy at 15 (Doc. 58-5).

ILU also issued Sunflower an RCC policy, which "affords coverage for costs in excess of a remediation plan incurred during the policy period." RCC policy at 2 (Doc. 58-6). Under the RCC policy, Sunflower is entitled to "'excess remediation costs' [that] arise out of 'Pollution Conditions' identified in the 'remediation plan' or are first discovered during the implementation of the 'remediation plan.'" RCC policy at 5.

On December 19, 2008, during the period of coverage, KDHE ordered Sunflower to investigate and remediate contaminated soils at the Plant (Doc. 58-7). These pollution conditions exist both inside and outside of existing SWMUs and AOCs. Also, these pollution conditions are not specifically listed in the RSA or the Remediation Plan. KDHE told Sunflower it was liable for remediation costs associated with these pollution conditions at the Plant.

On February 13, 2009, Sunflower submitted a claim to ILU under the RCC policy, but ILU did not immediately cover the claim. Instead, on April 9, 2009, ILU pointed Sunflower to the RCC policy terms that require Sunflower to submit a revised remediation plan to ILU for approval before Sunflower could file a claim under the RCC policy. *See* RCC policy at 10. Sunflower interpreted this response as a coverage denial and then submitted a claim under the PPL policy. On May 21, 2010, ILU denied coverage under the PPL policy because "the work

involved [is] related to the SWMUs or AOCs included within the scope of the RCC Policy." (Doc. 58 ¶ 53).

The specific pollution conditions at issue here are those referenced in the December letter from KDHE that are within the existing SWMUs and AOCs and that are not excluded from coverage by the enumerated list of SWMUs and AOCs in Endorsement 018 of the PPL policy ("New Pollution Conditions"). The parties do not dispute the New Pollution Conditions fall within the scope of the insuring agreement of the PPL policy, in that they are pollution conditions at the Plant as defined in the policy. The only issue in Phase I of this litigation is to determine whether a policy endorsement excludes the New Pollution Conditions from coverage. For the reasons outlined below, the Court finds an exclusion to coverage does not apply.

## Summary Judgment Standard

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). A party who moves for summary judgment bears the burden of showing there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A court must view the facts in light most favorable to the nonmoving party and allow the nonmoving party to benefit from all reasonable inferences to be drawn from the evidence. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588-89 (1986).

## Applicable Law

The Court previously decided Kansas law applies in this case. *See* Order Den. Remand and Transfer (Doc. 22). Additionally, endorsements attached to both the PPL and the RCC policies dictate Kansas law applies to questions relating to the interpretation of the policies. *See* (Docs. 58-5 at 21 & 58-6 at 25). The parties do not dispute Kansas law applies.

**Discussion**

The essence of this case is ILU's refusal to provide coverage for the New Pollution Conditions under the PPL policy. ILU supports its refusal to cover these expenses by arguing the costs could be covered under the RCC policy and that Endorsement 001 of the PPL policy is meant to exclude costs eligible for coverage by the RCC policy.[3] Sunflower argues Endorsement 001 does not exclude coverage and what *could* be covered by the RCC policy is irrelevant in determining what *is* covered by the PPL policy. Thus, the parties' dispute turns on the effect to be given to the PPL policy's Endorsement 001.

Under Kansas law, an insurance policy constitutes a contract and the interpretation of a contract is a question of law. *AMCO Ins. Co. v. Beck*, 929 P.2d 162, 165 (Kan. 1996). If the relevant facts are admitted, the court may decide whether they come within the terms of the contract. *Goforth v. Franklin Life Ins. Co.*, 449 P.2d 477, 481 (Kan. 1969).

To resolve this dispute, the Court must first determine whether the policies are ambiguous. Then the Court must determine whether the undisputed material facts and the language of Endorsement 001 exclude coverage.

**I.     The policies are unambiguous.**

The first question is whether the PPL policy or the RCC policy is ambiguous. The court should not strain to create an ambiguity where, in common sense, none exists. *Am. Family Mut. Ins. Co. v. Wilkins*, 179 P.3d 1104, 1110 (Kan. 2008). "To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language." *Patrons Mut. Ins. Ass'n v. Harmon*, 732 P.2d 741, 745 (Kan. 1987).

---

[3] In its initial briefing, ILU argued Endorsement 018 also excluded coverage but dropped that argument in its reply brief. *Compare* (Doc. 56 at 20) *with* (Doc. 61 at 15).

The parties agree the policies are unambiguous, and the Court concurs. After examining the PPL and RCC policies and the undisputed facts, the Court concludes there are no provisions that could have conflicting meaning given a natural and reasonable interpretation of the language used in the contracts. Thus, the policies are unambiguous.

> II. **Endorsement 001 of the PPL policy does not exclude the New Pollution Conditions.**

As previously noted, the crux of this dispute is the meaning of the PPL policy's Endorsement 001, a limitation of coverage. ILU argues the endorsement applies because: (1) the New Pollution Conditions are covered by the RCC policy; and (2) the endorsement excludes all pollution conditions discovered during the implementation of the Remediation Plan.

When an insurance contract is unambiguous, a court may not rewrite the contract for the parties; "[i]ts function is to enforce the contract as made." *Catholic Diocese of Dodge City v. Raymer*, 840 P.2d 456, 459 (Kan. 1992). The court must take unambiguous language in its plain and ordinary sense. *Warner v. Stover*, 153 P.3d 1245, 1247 (Kan. 2007). Thus, "[i]f the terms of the contract are clear, there is no room for rules of construction, and the intent of the parties is determined from the contract itself." *Liggatt v. Emp'rs Mut. Cas. Co.*, 46 P.3d 1120, 1125 (Kan. 2002). That is, the court must enforce an unambiguous contract according to its terms. *American Media, Inc. v. Home Indem. Co.*, 658 P.2d 1015, 1019 (Kan. 1983).

The court interprets the policy terms based on how a reasonably prudent insured would understand them. *O'Bryan v. Columbia Ins. Grp.*, 56 P.3d 789, 793 (Kan. 2002). Under Kansas law, the court narrowly construes restrictions or limitations of coverage. *Baugher v. Hartford Fire Ins. Co.*, 522 P.2d 401, 409 (Kan. 1974). If an insurer intends to restrict or limit the coverage it extends in the contract, it must do so in clear and unambiguous language. *Goforth*, 449 P.2d at 481. The underlying rationale is that "the insurer, having affirmatively expressed

6

coverage through broad promises, assumes a duty to define any limitations on that coverage in clear and explicit terms." *Westchester Fire Ins. Co. v. City of Pittsburg, Kan.*, 768 F. Supp. 1463, 1467 (D. Kan. 1991) (applying Kansas law).

An insurer has the burden of proving the applicability of an exclusionary clause. *Westchester Fire Ins. Co.*, 768 F. Supp. at 1469. Thus, ILU has the burden of proving the New Pollution Conditions fall under the Endorsement 001 exclusion.

Endorsement states "remediation costs . . . with respect to those . . . [p]ollution conditions **related to the implementation and management** of the remediation plan identified within [the RCC policy]" are not afforded coverage. PPL policy at 15 (emphasis added).

ILU's primary argument is that the purpose of Endorsement 001 is to exclude costs covered by the RCC Policy. ILU unequivocally states the New Pollution Conditions are covered by the RCC policy, and therefore, excluded by the PPL policy. ILU's premise is that the PPL and RCC polices provide "complementary rather than overlapping coverage" and that "what is covered under the remediation cost containment policy cannot be covered under the premises pollution liability policy and vice versa." Def.'s Sugg. in Supp. at 7 (Doc. 57).

To support this argument, ILU points to the insuring language of the RCC policy and the language of Endorsement 001 to demonstrate they are "virtually identical." The RCC insuring agreement states the policy will pay for "'excess remediation costs' . . . provided such 'excess remediation costs' arise out of 'Pollution Conditions' identified in the 'remediation plan' **or are first discovered during the implementation of the 'remediation plan**.'" RCC policy at 5 (emphasis added). The language in Endorsement 001 states "[p]ollution conditions **related to the implementation and management** of the remediation plan . . ." are not afforded coverage under the PPL policy. PPL policy at 15 (emphasis added). ILU explains "[t]his exclusionary

7

language mirrors the coverage provided under the RCC Policy. . . ." Def.'s Sugg. in Opp. at 14 (Doc. 60).

ILU's preoccupation with the RCC policy is misplaced. ILU devotes many pages of its briefs explaining why the New Pollution Conditions are covered by the RCC policy, and therefore, excluded by the PPL policy. It is clear the language of the RCC insuring agreement and Endorsement 001 of the PPL policy do not include "mirroring" language. The RCC policy covers pollution conditions that are "first discovered" during the implementation of the remediation plan and Endorsement 001 excludes coverage for pollution conditions "related to" the implementation and management of the remediation plan. Both policies use the word "implementation" to describe an activity, but one policy includes pollution conditions that are "first discovered" during this activity and the other excludes pollution conditions "related to" that activity. Also, Endorsement 001 includes pollution conditions related to the *management* of the Remediation Plan, language that is completely absent from the RCC policy.

The Court finds both policies are "custom" policies that were the result of negotiations between the parties. *See* PPL policy at 5 (title of policy is *Custom* Premises Pollution Liability II Insurance Policy (emphasis added)); RCC policy at 5 (title of policy is *Custom* Remediation Cost Containment Insurance Policy (emphasis added)); Def.'s Sugg. in Supp. at 5 (describing the policies as heavily negotiated). The parties could have used "mirroring" language to structure Endorsement 001 as a pure carve-out for losses that fall within the coverage of the RCC policy, but they did not.[4] Thus, ILU's argument that costs associated with pollution conditions covered by one policy are necessarily excluded by the other is rejected.[5]

---

[4] The "mirroring" language argument also fails because the policies don't even define "pollution conditions" the same way. *Compare* PPL policy at 7 (pollution conditions include pollutants and fungi, which is not listed in the RCC policy definition) *with* RCC policy at 7 (pollution conditions includes the *presence* of certain substances,

Next, ILU argues the plain language of Endorsement 001 excludes coverage for the New Pollution Conditions. ILU's interpretation of Endorsement 001 is that it encompasses "[pollution] conditions previously identified in [the Remediation Plan,] as well as any subsequent pollution conditions discovered during the implementation of the work." Def.'s Reply at 19 (Doc. 61). Based on this interpretation, ILU argues the New Pollution Conditions are excluded by Endorsement 001 even though they are not specifically listed in the Remediation Plan. ILU explains the Consent Order requires Sunflower to remediate *all* pollution conditions at the Plant. In turn, the RSA was developed to address the Consent Order. Finally, the Remediation Plan is a byproduct of the RSA. Therefore, ILU concludes, the New Pollution Conditions are incorporated into the Remediation Plan because the Remediation Plan relates back to the all-encompassing Consent Order.

This is an overbroad reading of the endorsement language. If ILU's interpretation were true, Endorsement 001 would exclude all remediation work, because any work could relate back to the broad "all pollution conditions" language of the Consent Order. This interpretation renders the PPL policy useless. Thus, the Court rejects ILU's theory that Endorsement 001 excludes the New Pollution Conditions because the Remediation Plan is a byproduct of the Consent Order.

Ultimately, to resolve this issue, the Court must look at the policy terms as a reasonable prudent insured would understand them and take the endorsement language in its "plain and ordinary sense." The word "related" means "connected by reason." Webster's Third New

---

which is missing from the PPL policy). Based on the differing language used and definition of key terms, it cannot be said all costs covered by the RCC policy are excluded from the PPL policy by the language of Endorsement 001.

[5] The Court expresses no opinion whether the PPL and RCC policies provide overlapping or complementary coverage or whether Endorsement 001 excludes any costs that are covered by the RCC policy. Additionally, the Court expresses no opinion on whether the New Pollution Conditions are covered by the RCC policy. All of these issues are outside the scope of Phase I.

International Dictionary 1916 (2002). "Implement" means "to carry out, accomplish, fulfill." *Id.* at 1134. "Manage" means to "control" or "direct." *Id.* at 1371. Therefore, Endorsement 001 excludes costs for pollution conditions connected with carrying out and directing the Remediation Plan.

Here, there are no facts establishing any sort of relationship between Sunflower's execution of the Remediation Plan and the New Pollution Conditions. The origin of the New Pollution Conditions was the December KDHE letter requesting Sunflower to investigate and remediate the New Pollution Conditions. The undisputed facts do not suggest that Sunflower's work on the Remediation Plan prompted the KDHE letter or that the New Pollution Conditions were discovered as a result of executing the Remediation Plan. Likewise, the undisputed facts do not support a claim that Sunflower's management activities to direct the execution of the Remediation Plan initiated the KDHE December letter. Therefore, ILU has not carried their burden to demonstrate Endorsement 001 applies. The Court finds the New Pollution Conditions are not connected with carrying out or directing the Remediation Plan and Endorsement 001 does not exclude the New Pollution Conditions.

### III. Whether Sunflower submitted a valid claim and has met all of the policy's requirements is beyond the scope of Phase I.

Sunflower asserts it made a proper claim under the PPL policy because the letter from KDHE was a "claim," as defined in the policy, which triggers the policy's coverage. This issue is beyond the scope of Phase I. The parties limited Phase I to "the issue of whether pollution conditions within the [SWMUs and AOCs] are excluded from coverage under the PPL Policy." (Doc. 29). On this issue, Sunflower's motion is DENIED and ILU's motion is GRANTED.

## Conclusion

Plaintiff's motion for partial summary judgment (Doc. 57) is GRANTED IN PART and the Defendant's motion (Doc. 55) is DENIED IN PART because the Court finds the pollution conditions subject to Phase I are not excluded by an endorsement to the PPL policy.

Additionally, both parties' motions are DENIED WITHOUT PREJUDICE as to whether: (1) the PPL and RCC policies provide overlapping or complementary coverage; (2) Endorsement 001 of the PPL policy excludes any costs covered by the RCC policy; (3) the New Pollution Conditions are covered by the RCC policy; or (4) Sunflower submitted a valid claim under the PPL policy or met the policy preconditions; because these issues are outside the scope of Phase I.

**IT IS SO ORDERED.**

Date:  May 2, 2017                               /s/ Greg Kays
                                                 GREG KAYS, CHIEF JUDGE
                                                 UNITED STATES DISTRICT COURT