**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| SUNFLOWER REDEVELOPMENT, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:15-CV-00577-DGK |
| | ) | |
| ILLINOIS UNION INSURANCE CO., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

This case arises out of an insurance coverage dispute. After insurer Defendant Illinois Union Insurance Co. ("ILU") refused to indemnify Plaintiff Sunflower Redevelopment, LLC ("Sunflower"), Sunflower sued for declaratory judgment and breach of contract.

At the parties' request, the Court agreed to separate the litigation of this case into two phases (Doc. 29). The issue in Phase I was whether certain pollution conditions within particular areas of the Plant were excluded from coverage under a Premise Pollution Liability ("PPL") insurance policy. The Court found none of the endorsements to the PPL policy excluded coverage for these particular costs. *See* (Doc. 65). Phase II concerns all other issues to determine whether ILU has a duty to defend and indemnify Sunflower under the PPL policy.

Now before the Court are the parties' cross-motions for summary judgment (Docs. 120 and 121). For the reasons set forth below, the Court GRANTS IN PART Plaintiff's motion (Doc. 120), and DENIES Defendant's motion (Doc. 121).

## Undisputed Material Facts[1]

At the heart of this dispute is the former Sunflower Army Ammunition Plant ("Plant"). Sunflower is a limited liability company formed under the laws of Kansas. Its members are other businesses, one whose address is in Colorado. Sunflower maintains a registered agent office in the state of Kansas and its mailing address is Kansas City, Missouri. Sunflower has an office in Kansas City, Missouri where one of its two employees works. The other employee works at the Plant. IRG Environmental, LLC ("IRG") was Sunflower's insurance broker.

At the time ILU issued the insurance policies at issue, it was owned by one of the insurance companies with the ACE Group of Companies. Relevant to this dispute, ILU's claims personnel, who reviewed and evaluated Sunflower's claims for coverage, were located in New York.

The Plant consists of approximately 9,035 acres in Johnson County, Kansas. The Army manufactured power and propellant munitions, and nitric and sulfuric acids at the Plant. During its operation, spills and releases of propellant, heavy metals, nitrate compounds, and other pollutants contaminated various parts of the Plant property. Due to these activities, numerous areas of the property were determined to be heavily polluted. In 1998, the Army determined it no longer needed the Plant. Sunflower sought to purchase the property with a vision to clean up the pollutants and develop the land.

On August 3, 2005, Sunflower entered into an agreement with the Army to purchase the Plant. The conveyance was made subject to the pollution conditions. On the same day, Sunflower entered into a Remediation Services Agreement ("RSA") with the United States, which obligated Sunflower to purchase environmental insurance, secure the worksite, and

---

[1] The Court excluded asserted facts that were immaterial to the resolution of the pending motion, asserted facts that were not properly supported by admissible evidence, legal conclusions, and argument presented as an assertion of fact.

perform certain remediation work. In exchange, the Army would pay Sunflower for the outlined remediation work. The Army and Sunflower codified the specific remediation work covered by the RSA into the "Remediation Plan."

Also on August 3, 2005, the Kansas Department of Health and Environment ("KDHE") issued a Consent Order obligating Sunflower to remediate certain pollution conditions at the Plant before Sunflower could develop the property. The Consent Order also addressed financing the pollution remediation, which consisted of money from the Army and a requirement to purchase PPL and Remediation Cost Containment ("RCC") insurance.

With the money the Consent Order obligated the Army to pay to Sunflower, the Consent Order required Sunflower and the Army to establish three trust accounts to hold the Army's payments to Sunflower: (1) an Installation Action Plan ("IAP") account; (2) a Munitions & Explosives of Concern ("MEC") account; and (3) a Developer account to hold the Army's payments to Sunflower. The trust agreements for the IAP and Developer accounts both state they are established by the Army, Sunflower, and the trustee, for the benefit of KDHE. For both accounts, the agreement states that the funds within the trust accounts would be used to pay for various expenses related to the remediation project. Additionally, payments from the account can only be made if mutually approved by Sunflower, KDHE, and the Army. Finally, the agreements state that at the termination of the project any money remaining in the IAP account shall be deposited into the Developer account, and money remaining in the Developer account shall be delivered to Sunflower.

As to the insurance requirement of the Consent Order, ILU[2] issued Sunflower two custom polices, that were the result of negotiations between the parties. The PPL insurance policy

---

[2] Sunflower initially purchased PPL insurance from Quanta, but in 2008, Quanta went out of business. It was at that time that Sunflower purchased the PPL insurance from ILU.

3

provides coverage for unknown, and certain known, pre-existing pollution conditions at the Plant. The policy was effective from March 2, 2008 to August 4, 2015.[3] Excluded from coverage of the PPL policy are claims made prior to the policy inception date and known conditions. As defined by the policy, known conditions are pollution conditions that existed prior to the policy period. However, known conditions do not include conditions listed in Endorsement 008.

Other relevant endorsements to the PPL policy are Endorsements 001 and 018. Endorsement 001 excludes coverage for "'remediation costs' . . . with respect to those 'pollution conditions' . . . related to the implementation and management of the 'remediation plan' identified within [the] Remediation Plan Schedule endorsement of the [RCC policy]." PPL policy (Doc. 122-2 at 258). Endorsement 018 of the PPL policy excludes coverage for, among other things, "remediation costs" associated with the Remediation Plan.

The RCC policy affords coverage for costs that exceed the Remediation Plan. The RCC Policy's Endorsement 002 limits coverage of the RCC Policy to the Remediation Plan, which is identified within the RSA and further delineated by the items listed in the endorsement.

On December 19, 2008, KDHE sent a letter to Sunflower requesting that Sunflower submit a work plan "to investigate pesticide, lead based paint (LBP) contaminated soils, or other contaminants for buildings" located within certain areas of the Plant. KDHE December Letter (Doc. 122-2 at 322). The letter further states "KDHE [had previously] requested that [Sunflower] perform an intrusive investigation for [lead based paint] soil contamination and visually inspect for pesticide application holes and other apparent contamination for buildings in and around SWMU 63." *Id.*

---

[3] However, the Court notes the policy period listed on each page of the endorsements is March 30, 2008 to August 4, 2015.

Sunflower construed this letter as a third-party claim against it, and on February 13, 2009, submitted the KDHE December Letter, a letter KDHE sent in February following-up on the December letter, and an Environmental Risk Loss Notification Form to ILU. The loss notification form listed the insured as Sunflower and the broker/agent as IRG. In a letter attached to this submission, Sunflower requested that ILU confirm coverage for this claim, provide advice, and exercise all rights and duties provided for by the insurance policies.

On April 9, 2009, ILU responded to Sunflower's letter and asked Sunflower to clarify whether it was making a claim against the PPL policy, the RCC policy, or both. However, ILU then responded as if Sunflower was seeking a claim under the RCC Policy.

Sunflower's counsel responded in a letter dated May 12, 2009, stating it was Sunflower's position that KDHE's claim falls within the coverage of the PPL policy and that ILU did not respond as to the PPL policy.

Counsel for ILU quickly responded and explained its position was that the PPL policy can only triggered when Sunflower discovers a pollution condition. Rather, ILU believed that KDHE's letter requested Sunflower to "investigate for additional areas of potential contamination . . . to determine if there is a 'pollution condition.'" *Id.* ILU further stated,

> [t]he cost for investigating a potential "pollution condition," however, is not a cost covered under the PPL Policy. While the PPL Policy's definition of "remediation costs" includes costs associated with investigating a "pollution condition," that is not the same as investigating to determine if there is a "pollution condition."

*Id.* The letter concludes by stating Sunflower had not reported a matter that is covered by the PPL policy, but that if Sunflower reports a pollution condition that requires remediation costs, ILU will then determine if that pollution condition qualifies for coverage under the PPL policy.

The next communication before the Court is a letter dated August 24, 2009, that counsel for ILU sent to counsel for Sunflower. Referring to the May letter, ILU explained "we stated that because [Sunflower] had not advised of an actual and existing 'pollution condition' at the [Plant], [ILU] was under no present obligation to address coverage under the PPL policy." August 24, 2009, Letter (Doc. 122-11 at 1). ILU reiterated that it did not view this matter as one that triggered the PPL policy.

On December 10, 2009, ILU sent a letter to IRG stating that it understood Sunflower's position to be that it was seeking coverage for investigative work under the PPL policy. ILU reiterated its position that "until [Sunflower] advises of an existing actual 'pollution condition' at the [Plant], then [ILU's] obligations under the referenced PPL Policy, if any, are not triggered" and "coverage cannot be considered under the PPL Policy in absence of a confirmed 'pollution condition.'" December 10, 2009, Letter (Doc. 122-13 at 1). ILU also responded to the additional documentation Sunflower provided in support of its claim under the PPL policy stating "[t]hese materials do not indicate the presence of an additional 'pollution condition', and "[b]ecause these new documents do not indicate the presence of a new 'pollution condition,' ACE reiterates its prior interim coverage position." *Id.* at 2.

Sunflower filed a two-count lawsuit seeking declaratory judgment that the pollution conditions at issue are covered by the PPL policy and for damages for breach of contract.

Because of the complexity of the policies and the issues presented, at the parties' request, the Court agreed to separate the litigation of this case into two phases (Doc. 29). The issue in Phase I was whether certain pollution conditions at particular locations within the Plant property were excluded from coverage under the PPL policy. The Court found none of the endorsements

to the PPL Policy excluded coverage for those conditions. Phase II concerns all other issues to determine Sunflower's claims again ILU.

## Summary Judgment Standard

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). A party who moves for summary judgment bears the burden of showing there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A court must view the facts in light most favorable to the nonmoving party and allow the nonmoving party to benefit from all reasonable inferences to be drawn from the evidence. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588-89 (1986).

## Applicable Law

The Court previously decided Kansas law applies in this case. *See* Order Den. Remand and Transfer (Doc. 22). Additionally, endorsements attached to both the PPL and the RCC policies dictate Kansas law applies to questions relating to the interpretation of the policies. *See* (Doc. 122-2 at 264, 310). The parties do not dispute Kansas law applies.

## Discussion

The essence of this case is ILU's refusal to provide coverage for certain pollution conditions Sunflower believes fall within the scope of the PPL policy. Sunflower maintains the PPL policy covers the pollution conditions and moves for partial summary judgment as to a subset of those conditions. ILU maintains Sunflower has not demonstrated an actual pollution condition exists and also refuses coverage under several other theories, each addressed below.

Under Kansas law, an insurance policy constitutes a contract and the interpretation of a contract is a question of law. *AMCO Ins. Co. v. Beck*, 929 P.2d 162, 165 (Kan. 1996). If the

relevant facts are admitted, the court may decide whether they come within the terms of the contract. *Goforth v. Franklin Life Ins. Co.*, 449 P.2d 477, 481 (Kan. 1969).

The parties agree the insurance policies at issue are unambiguous (Doc. 51) and the Court concluded the same in its Order on Phase I summary judgment (Doc. 65). When an insurance contract is unambiguous, a court may not rewrite the contract for the parties; "[i]ts function is to enforce the contract as made." *Catholic Diocese of Dodge City v. Raymer*, 840 P.2d 456, 459 (Kan. 1992). The court must take unambiguous language in its plain and ordinary sense. *Warner v. Stover*, 153 P.3d 1245, 1247 (Kan. 2007). Thus, "[i]f the terms of the contract are clear, there is no room for rules of construction, and the intent of the parties is determined from the contract itself." *Liggatt v. Emp'rs Mut. Cas. Co.*, 46 P.3d 1120, 1125 (Kan. 2002). That is, the court must enforce an unambiguous contract according to its terms. *Am. Media, Inc. v. Home Indem. Co.*, 658 P.2d 1015, 1019 (Kan. 1983).

## I.     Sunflower's motion for summary judgment is GRANTED IN PART.

Turning first to Sunflower's motion for partial summary judgment, Sunflower argues it is entitled to summary judgment on its claim that the PPL policy covers remediation costs arising out of three particular pollution conditions, applied pesticides, lead based paint, and asbestos-containing materials ("ACM") in soils. Sunflower points to the letters exchanged with ILU and summarizes that one of the reasons ILU denied its claim was that Sunflower had not provided proof of an actual or existing pollution condition. Sunflower argues that "actual" and "existing" are not terms within the policy, and thus are not required for coverage. Sunflower argues next that even if an actual or existing pollution condition is required, they have submitted documents demonstrating this condition.

Lastly, Sunflower seeks a declaration that the PPL policy covers these three pollution conditions and that the only remaining issues for trial are: (1) whether the remediation costs for these pollution conditions were a reasonable amount; and (2) whether remediation costs for other contamination, fuel/oil and lime slurry, are covered by the PPL policy and are a reasonable amount.

### A. The PPL policy does not require an actual or existing pollution condition.

In its letters to Sunflower, ILU repeatedly states Sunflower had not triggered the PPL policy because it has not advised ILU of an "actual" or "existing" pollution condition. *See* May 18, 2009, Letter (Doc. 122-9 at 1) ("Based on the information provided to date, [Sunflower] has not advised of an *actual* 'pollution condition' for which there is any present obligation under the PPL Policy.") (emphasis added); August 24, 2009, Letter (Doc. 122-11 at 1) (referring to the May letter, "we stated that because [Sunflower] had not advised of an *actual and existing* 'pollution condition' at the 'covered location,' [ILU] was under no present obligation to address coverage under the PPL policy.") (emphasis added); December 10, 2009, Letter (Doc. 122-13 at 2) (responding to Sunflower's submitted of documents, "[t]hese materials do not indicate the presence of an *additional* 'pollution condition'", "coverage cannot be considered under the PPL Policy in the absence of a *confirmed* 'pollution condition'", and "[b]ecause these new documents do not indicate the presence of a *new* 'pollution condition,' [ILU] reiterates its prior interim coverage position.") (emphasis added). The issue for the Court to decide is whether, under the plain language of the PPL policy, the policy requires an "actual" or "existing" pollution condition in order to trigger coverage.

The Insuring Agreement of the PPL policy states:

> [ILU] agrees to pay on behalf of [Sunflower] for . . . "claims", "remediation costs", and associated "legal defense expenses" in

excess of the "self-insured retention", arising out of a "pollution condition" on, at, under, or migrating from the [Plant], provided the "claim" is first made . . . during the "policy period" . . .

PPL Policy as modified by Endorsement 014 (Doc. 122-2 at 248, 272). Based on this, both claims and remediation costs that arise out of a pollution condition are covered under the policy. A claim is defined as "the assertion of a legal right, including but not limited to a 'government action' . . . alleging responsibility or liability on the part of the 'insured' for 'bodily injury', 'property damage', or 'remediation costs' arising out of 'pollution conditions' to which this insurance applies." PPL Policy (Doc. 122-2 at 250). Remediation costs are "reasonable expenses incurred to investigate, quantify, monitor, mitigate, abate, remove, dispose, treat, neutralize, or immobilize 'pollution conditions' . . . ." PPL Policy (Doc. 122-2 at 251).

The insuring agreement, the definition of a claim, and the definition of remediation costs all involve a pollution condition, which is defined by the policy as:

the discharge, dispersal, release, escape, migration, or seepage of any solid, liquid, gaseous or thermal irritant, contaminant, or pollutant, including smoke, soot, vapors, fumes, acids, alkalis, chemicals, "fungi", hazardous substances, hazardous materials, or waste materials, on, in, into, or upon land and structures thereupon, the atmosphere, surface water, or ground water. For the purpose of this definition, waste materials includes, but is not limited to "low level radioactive waste" and "mixed waste".

PPL Policy (Doc. 122-2 at 251).

To the extent ILU denied Sunflower's claims because Sunflower had not proved a pollution condition existed, that position is not supported by terms of the policy. In reading the plain language of the policy, neither the insuring agreement, the definition of "claim", remediation costs, or "pollution condition" use the modifier "actual" or "existing" to describe a pollution condition covered by the PPL policy.

When read in conjunction with the policy's definition of remediation costs, an actual or existing pollution condition is not a requirement. Remediation costs include expenses to investigate and quantify pollution conditions. Neither investigate nor quantify are defined within the policy, but the plain meaning of investigate is to "inquire into systematically," and quantify is to "measure the quantity of." Investigate, Quantify, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002). Thus, remediation costs include costs to inquire into the amount of a pollution condition. This definition contemplates that after an inquiry the quantity may be zero, thus the inquiry could be used to determine whether there is in fact a pollution condition. Thus, the plain language of the policy does not require a pollution condition already exist in order to trigger coverage.

ILU does not squarely address Sunflower's argument that the policy does not require an actual or existing pollution condition. ILU seems to assume these words exist. ILU states in their memorandum in opposition that they dispute whether there is an "actual or existing" pollution condition in the White Space Areas ("WSA") of the Plant, but agree "there is an actual or existing" pollution condition at the AOC and SWMU areas of the Plant. (Doc. 129 at 6).

Thus, the Court finds as a matter of law, that the PPL policy does not require an actual or existing pollution condition to trigger coverage. The Court cannot re-write the contract to include these modifiers to the term pollution condition. If the parties wanted the PPL Policy to cover only "actual" or "existing" pollution conditions, they could have drafted the policy to indicate that desire. Sunflower's motion for summary judgment on this issue is granted.

Finding that the PPL Policy does not require an actual or existing pollution condition, the Court need not determine whether Sunflower submitted sufficient documentation to ILU to demonstrate an actual pollution condition existed for the three pollution conditions at issue.

**B. The Court cannot declare that the costs Sunflower incurred to investigate and remediate applied pesticides, lead based paint, and ACM in soils are covered by the PPL policy.**

Sunflower also asks the Court to declare that the costs it incurred to investigate and remediate applied pesticides, lead based paint, and ACM in soils are covered by the PPL policy and should have been paid by ILU. As explained in § II, there are factual disputes as to whether coverage under the PPL policy exists[4] and accordingly, this portion of Sunflower's motion is denied.

**II. ILU's motion for summary judgment is DENIED.**

ILU moves for summary judgment on four theories it proffers supports its position that the PPL policy does not cover the costs at issue: (1) Sunflower has not paid for the remediation costs it seeks coverage for; (2) Sunflower did not make a claim during the policy period; (3) Endorsements 001 and 018 bar coverage; and (4) the statute of limitations bars Sunflower's cause of action. As discussed below, the Court finds factual disputes prevent granting summary judgment on each of these theories. Accordingly, ILU's motion is denied.

**A. A dispute of material fact exists as to Sunflower's compensable financial injury.**

ILU first seeks summary judgment on the theory that Sunflower has not, and will not, be financially injured. ILU points to the three trust accounts and the Army's independent efforts to remediate asbestos to argue Sunflower has not suffered a financial loss. Because there are disputes of material fact, the Court denies ILU's motion for summary judgment on this issue.

There are three categories of costs related to this argument: (1) costs to remediate applied pesticides and ACM in soils paid for with money from the trust accounts; (2) costs to

---

[4] For example, there is a dispute of fact as to whether the December and February letters from KDHE constitute a "claim" as defined by the PPL policy.

remediate ACM in soils paid for by the Army through its independent efforts; and (3) future costs to remediate ACM in soils.

Kansas law prohibits recovery "in excess of the damages sustained." *Ingram v. Howard-Needles-Tammen & Bergendoff*, 234 Kan. 289, 303 (1983). In a breach of contract case, compensatory damages award must be offset by the amount of benefit the plaintiff has already received. *See Hayes Sight & Sound, Inc. v. ONEOK, Inc.*, 281 Kan. 1287, 1300 (2006); *Rose v. Via Christi Health Sys., Inc.*, 279 Kan. 523, 527-28 (2005) (partial payment of damages constitutes a credit and may be deducted from any settlement or final judgment rendered).

As to the costs to remediate applied pesticides and ACM in soils paid for with money from the trust accounts, ILU argues Sunflower is not "out of pocket" for any expenses because the money to originally fund the trust accounts came from the Army.[5] Sunflower argues that it suffered a loss when the trust account money was spent on remediation costs that should have been covered by the PPL Policy because the trust account agreements provide that any remaining funds are directed to Sunflower.

ILU's argument that the Army paid for these costs is fallacious. ILU's argument requires the Court to find that the Army retained ownership of the money the Consent order required it to pay to Sunflower and required Sunflower to place into the trust accounts. ILU does not cite to any legal authority, nor any provision of the Consent Order or the trust agreements, supporting this position.

However, Sunflower points to the provisions of the trust account agreements that the Consent Order required the Army to deposit these funds into the accounts and that any money

---

[5] Instead of referring to the trust accounts, ILU insists on the phrasing "paid in full by the Army" or "reimbursement by the Army." Because the Court is concerned that this phrasing mischaracterizes the facts and may confuse the jury, ILU is prohibited from arguing at trial that money paid from the trust accounts is "a reimbursement by the Army" unless it can provide legal authority to support this position.

remaining in the account are to be distributed to Sunflower.  Sunflower argues, under the terms of the trust account agreements, if trust account money is spent on costs that should be covered by the PPL policy, it is not available for distribution to Sunflower, and thus, Sunflower sustains a loss.

Sunflower has submitted sufficient facts that would permit a reasonable juror to find that it suffered a financial loss by using money from the trust account to pay for expenses that should have been covered by the PPL policy.

Next, as to the ACM remediation work the Army undertook, ILU argues that Sunflower has not paid for these expenses and thus should not be able to recover damages for those costs.  Sunflower argues the Army is an additional insured under the PPL Policy and so it has authority to seek coverage for expenses incurred by the Army.  Sunflower has submitted sufficient facts that create a dispute as to whether Sunflower could recover the costs for the remediation the Army has already completed.

Finally, as to the future remediation costs for ACM, ILU states the Army will continue to pay for this remediation and as such, Sunflower cannot recover for these expenses.  Sunflower argues it is speculation to assume the Army will continue to remediate ACM and will eventually complete that work.  The Court agrees, there are no facts in the record stating that the Army will continue to remediate ACM and will complete that effort at no cost to Sunflower.  Accordingly, ILU's motion for summary judgment on this issue is denied.

**B. There are factual disputes as to whether Sunflower made a proper and timely claim.**

Next, ILU moves for summary judgment on the theory that there was a defect in Sunflower's claim submissions.

**1.  A factual question exists whether the KDHE letters are a "claim."**

ILU argues the December and February KDHE letters are not claims because they do not meet the definition of claim as defined by the PPL Policy.

A claim under the PPL Policy has four elements:  (1) "the assertion of a legal right, including but not limited to a 'government action' . . ."; (2) an allegation of "responsibility or liability on the part of the 'insured'"; (3) "for 'bodily injury', 'property damage', or 'remediation costs'"; and (4) "arising out of 'pollution conditions' to which this insurance applies."  PPL Policy (Doc. 122-2 at 250).

The parties do not dispute many of the underlying facts, but rather if the facts meet the elements of the definition of a claim.  The primary dispute seems to be whether the letters assert an allegation of responsibility against Sunflower.  ILU argues the letters merely remind Sunflower what it is already required to do under the RSA.  Sunflower argues the letters state it is Sunflower's responsibility to investigate and remediate applied pesticides and lead based paint in soils.  A reasonable juror may find that the letters assert a responsibility as to Sunflower and otherwise meet the definition of a claim.  Thus, ILU's motion for summary judgment on this issue is denied.

**2.  Assuming a claim was made, a reasonable juror may find that the pesticide claim was made during the policy period.**

ILU argues the claim as to applied pesticides was made in 2007, prior to the inception date of the PPL policy and thus, is barred as untimely.

The PPL policy excludes claims made prior to the policy inception date.  However, Endorsement 008 provides that pollution conditions referenced or identified in the documents listed on the Schedule of Known Conditions are deemed to be first discovered during the policy period.

Sunflower simply points to Endorsement 008 and argues one of the documents listed in this endorsement involves applied pesticides and thus that pollution condition is deemed first discovered during the policy period. The Court finds Sunflower has submitted sufficient evidence that a reasonable juror may find that the pesticide claim was made during the policy period.

### 3. A reasonable juror may find that Sunflower complied with the requirements of the PPL Policy triggering coverage as to the WSAs.

ILU argues Sunflower did not make a claim as to fuel/oil contamination, ACM, and lime slurry in WSAs and submits evidence that Sunflower admitted it did not file a claim for these pollution conditions in these areas. Sunflower responds with evidence that it provided notice, as defined in the PPL policy, of these condition. The Court finds Sunflower has submitted sufficient evidence that a reasonable juror may find that Sunflower complied with the terms of the PPL policy as to trigger coverage for pollution conditions in the WSAs.

### C. The Court does not find as a matter of law that the RSA incorporates applied pesticide and ACM in soil.

Next, ILU contends that the RSA contemplated asbestos and pesticides, and by extension, these pollution conditions are excluded from coverage through Endorsements 001 and 018.

Although stated slightly differently, Endorsements 001 and 018 of the PPL Policy point to Endorsement 002 of the RCC policy[6] to exclude certain work items that are within the Remediation Plan, which the RCC policy defines as work "identified within the [RSA] and further delineated by the following scope descriptions," and then lists various work items.

ILU points to three portions of the RSA it claims support its contention that the RSA "expressly identifies" both asbestos and pesticides. In reviewing these portions, the Court has

---

[6] The Court notes Endorsement 001 and 018 reference an incorrect policy number for the RCC policy.

concerns that ILU has quoted sections of the RSA, but has done so in a way that implies those portions of the RSA mean something different from what they actually state. This is unacceptable.

First, ILU argues Sunflower assumed responsibility for remediation necessitated by "routine application of pesticides in accordance with manufacturer's instructions," quoting to § D(2) of the RSA.

The relevant portion of § D of the RSA states:

> In consideration of the payments, promises and covenants of this Contract, [Sunflower] agrees that it will:
> . . .
> 2. Assume responsibility for remediation requirements under the Consent Order that *exceed the scope of this Contract* at no cost to the Government *including* but not limited to . . . routine application of pesticides in accordance with manufacturers instruction.

(Doc. 122-2 at 124) (emphasis added). ILU's first argument is rejected. While this section of the RSA does include a reference to pesticides, it plainly indicates that remediation to address the application of pesticides "exceed[s] the scope" of the RSA.

Second, ILU argues the RSA incorporates asbestos because it states "[t]he cleanup process includes disposal of some of the buildings by burning in place and disposal of asbestos, hazardous material and scrap metal" and that Sunflower would have responsibility for "asbestos removal and disposal (for non-friable and friable types)." ILU's Suggestions in Supp. (Doc. 123 at 28) (quoting RSA (Doc. 122-2 at 203, 217)).

ILU's first quote comes from Attachment A of the RSA, titled Installation and Site Information, but it does not support its position that all asbestos removal was included with the in the RSA. This provision states that asbestos removal associated with buildings is included as

part of the clean-up process, but does not mention asbestos in soils. ILU's other quote comes from the § 6.1.1 of the Scope of Work section of the RSA. Section 6 is titled Decontamination of Above Ground Structures and read within context of the entire § 6, the responsibility to remove asbestos is related to asbestos in buildings and above ground structures, not in soils. Based on a complete reading of the cited provisions of the RSA, the Court cannot find as a matter of law that asbestos in the soil is within the scope of the RSA.

Third, ILU argues that because Sunflower has been remediating asbestos and pesticide conditions before the February KDHE letter using money from the trust accounts, these conditions must be provided for in the RSA.

ILU's argument requires the Court to find that the funds in the trusts could only be withdrawn for expenses incurred for items within the RSA. ILU does not point to any specific provision of the IAP or the Developer trust agreement that states this. In reviewing the trust agreements, the Court cannot locate a provision that supports ILU's argument. Rather, the IAP and Developer trust agreements state in a section titled Authorized Payments from the Fund, "payments will be used to complete closure and/or, post-closure care and/or corrective action work as set forth in the *Consent Order* . . . and pay all other *Consent Order* related costs that are mutually agreeable to [Sunflower], KDHE and the Army." (Docs. 123-10 at 3 and 123-12 at 3) (emphasis added). Without more from ILU, the Court cannot find that as a matter of law any money withdrawn from the IAP or Developer trust accounts to pay for remediation costs for pesticides was done so only because those costs were within the scope of the RSA.

Based on the facts presented, the Court cannot find that the RSA incorporates applied pesticides and ACM in soil. Thus, ILU's argument that those conditions are within the RSA and thus excluded by Endorsements 001 and 018, fails.[7]

### D. The Court cannot find as a matter of law the statute of limitations bars Sunflower's claims.

Lastly, ILU argues the statute of limitations bars Sunflower's claims. The parties dispute whether the longer statute of limitations of Missouri applies or the shorter New York, Colorado, or Kansas limitations periods apply.

A federal court sitting in diversity applies the statute of limitations rules of the forum. *Great Plains Trust Co. v. Union Pacific R. Co.*, 492 F.3d 986, 992 (8th Cir. 2007). Thus, for purposes of analyzing the applicable statute of limitations, Missouri law applies.

Under Missouri law, to determine which state statute of limitation applies, courts apply Missouri's "borrowing statute." *Id.* Under the borrowing statute, the statute of limitations for the state in which the action 'originated' applies. Mo. Rev. Stat. § 516.190; *Great Plains Trust Co.*, 492 F.3d at 992 ("The critical issue in applying this statute is determining where a cause of action originated."). "Under the statute, 'originated' means 'accrued.'" *Great Plains Trust Co.*, 492 F.3d at 992.

This case involves a contract dispute and the Missouri borrowing statute directs to Mo. Rev. Stat. § 516.100 to determine when and where a contract claim accrues. *Id.* (citing *Ferrellgas, Inc. v. Edward A. Smith, P.C.*, 190 S.W.3d 615, 623 (Mo. Ct. App. 2006)). Section 516.100 states a cause of action accrues when the damage resulting from the breach of contract is sustained and is capable of ascertainment. "Accordingly, a cause of action accrues *where* damages are capable of ascertainment." *Id.* (emphasis in original). "[F]or cases involving purely

---

[7] To the extent ILU is seeking summary judgment that asbestos in buildings within SWMUS and AOCs is excluded from the PPL policy, Sunflower concedes that point, and that portion of the motion is granted.

economic injury, as opposed to a physical accident with economic consequences, a cause of action originates where the plaintiff is financially damaged, which for a corporation is often its place of business." *Id.* at 993. Therefore, in order for the Court to determine which state's statute of limitations applies, it must first determine where Sunflower was financially damaged.

ILU argues Sunflower's principal place of business is Kansas because it is a Kansas LLC and it has a registered agent office in Kansas. ILU does not point to any law that supports its argument that a registered agent office is, as a matter of law, the principal place of business.

ILU argues Sunflower was financially harmed in Colorado because one of Sunflower's members is a Colorado based business and because IRG is based in Colorado. ILU does not cite any law that an LLC's principal place of business is the location of one of its members. As to IRG's place of business, the Court is again concerned and troubled because ILU references IRG as both Sunflower's "insurance broker" and its "Risk Management Department in Colorado." *Compare* (Doc. 123 at 14) *with* (Doc. 123 at 25). Sunflower denies it has a risk management department in Colorado, yet fully admits IRG was its insurance broker. It appears that for purposes of the statute of limitations defense, ILU has twisted IRG's role in order to create a place of business for Sunflower in Colorado. There are no facts Sunflower has a risk management department in Colorado and many undisputed facts that IRG was Sunflower's insurance broker. *See, e.g.*, (Doc. 122-2 at 332) (listing IRG under Broker/Agent's Name on the Loss Notification Form). As such, at trial, ILU is prohibited from arguing that IRG is Sunflower's Colorado-based risk management department.

ILU also argues that New York is where Sunflower was financially harmed because that is location where ILU's claims department denied Sunflower's claim.

All of these arguments are meritless.  Sunflower has asserted undisputed facts that state its principal place of business is Missouri because that is where it's office is located and where its management-level employee works.  Thus, ILU's motion on this issue is denied.

**Conclusion**

Plaintiff's motion for partial summary judgment (Doc. 120) is GRANTED IN PART and the Defendant's motion (Doc. 121) is DENIED.

**IT IS SO ORDERED.**

Date:  March 16, 2018                              /s/ Greg Kays
                                                   GREG KAYS, CHIEF JUDGE
                                                   UNITED STATES DISTRICT COURT