# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | | |
|---|---|---|
| SUNFLOWER REDEVELOPMENT, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:15-CV-00577-DGK |
| | ) | |
| ILLINOIS UNION INSURANCE CO., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT

This case arises out of an insurance coverage dispute. After insurer Defendant Illinois Union Insurance Co. ("ILU") refused to indemnify Plaintiff Sunflower Redevelopment, LLC ("Sunflower"), Sunflower sued for declaratory judgment and breach of contract.

The parties previously filed cross motions for summary judgment, which the Court granted in part and denied in part (Doc. 168). Subsequently, the trial was reset because of a scheduling conflict with the Court. The parties took this additional time to file another round of partial summary judgment motions (Docs. 205 & 211). Having reviewed the parties' arguments and the operative insurance policies, the Court GRANTS Plaintiff's motion (Doc. 205) and DENIES Defendant's motion (Doc. 211).

### Undisputed Material Facts[1]

At the heart of this dispute is the former Sunflower Army Ammunition Plant ("Plant"), consisting of approximately 9,035 acres in Johnson County, Kansas. The Army manufactured power and propellant munitions, and nitric and sulfuric acids at the Plant. During its operation, spills and releases of propellant, heavy metals, nitrate compounds, and other pollutants

---

[1] The Court excluded asserted facts that were immaterial to the resolution of the pending motion, asserted facts that were not properly supported by admissible evidence, legal conclusions, and argument presented as an assertion of fact.

contaminated various parts of the Plant property. Due to these activities, numerous areas of the property were determined to be heavily polluted. In 1998, the Army determined it no longer needed the Plant. Sunflower sought to purchase the property with a vision to clean up the pollutants and develop the land.

On August 3, 2005, Sunflower entered into an agreement with the Army to purchase the Plant. The conveyance was made subject to the pollution conditions. On the same day, Sunflower entered into a Remediation Services Agreement ("RSA") with the United States, which obligated Sunflower to purchase environmental insurance and perform certain remediation work. In exchange, the Army would pay Sunflower for the outlined remediation work. The Army and Sunflower codified the specific remediation work covered by the RSA into the "Remediation Plan." The Remediation Plan categorized work by defined locations within the Plant, identified as Solid Waste Management Units ("SWMU") and Areas of Concern ("AOC").

Also on August 3, 2005, the Kansas Department of Health and Environment ("KDHE") issued a Consent Order obligating Sunflower to remediate certain pollution conditions at the Plant before Sunflower could develop the property.

In accordance with the requirements of the Consent Order, Sunflower purchased two custom insurance policies from ILU.[2] The Remediation Cost Containment ("RCC") policy affords coverage for costs that exceed the Remediation Plan. The RCC Policy's Endorsement 002 defines the scope of the Remediation Plan as the RSA and the other items listed within the endorsement.

---

[2] Sunflower initially purchased insurance from Quanta, but in 2008, Quanta went out of business. Subsequently, Sunflower purchased insurance from ILU.

The Premises Pollution Liability ("PPL") policy is a "claims-made" policy and was effective from March 20, 2008 to August 4, 2015.[3] It provides coverage for unknown and certain known, pre-existing pollution conditions at the Plant. Specifically, the insuring agreement, as modified by Endorsement 014, grants coverage for "'[c]laims', 'remediation costs', and associated 'legal defense expenses' . . . arising out of a 'pollution condition' . . . provided the 'claim' is first made during the 'policy period'." PPL policy (Doc. 206-1 at 135, 159).

The policy defines a claim as "the assertion of a legal right, including but not limited to a 'government action(s)', suits or other actions alleging responsibility or liability on the part of the 'insured' for 'bodily injury', 'property damage', or 'remediation costs' arising out of 'pollution conditions' to which this insurance applies." *Id.* at 137. Remediation costs are defined as:

> expenses incurred to investigate, quantify, monitor, mitigate, abate, remove, dispose, treat, neutralize, or immobilize "pollution conditions": a) to the extent required by "environmental law"; b) in response to an imminent and substantial endangerment to the public health or welfare, or to the environment; c) that have been actually incurred by a government agency or body acting under the authority of "environmental law"; or d) to satisfy the requirement of a voluntary cleanup program.

*Id.* at 138.

Relevant to this dispute, there are four exclusions to the PPL policy. First, claims made prior to the policy's inception date. *Id.* at 139. Second, known conditions, defined as pollution conditions that existed prior to the policy period. *Id.* at 140. However, known conditions do not include conditions listed in Endorsement 008, Schedule of Known Conditions, and any pollution condition specifically referenced or identified in documents listed in Endorsement 008. *Id.*

---

[3] However, the Court notes the policy period listed on each page of the endorsements is March 30, 2008 to August 4, 2015.

These items are deemed to be first discovered during the policy period. *Id.* One document listed in Endorsement 008 is called 200-5a Pest Management Files. *Id.* at 152. Third, "remediation costs" for "'pollution conditions' related to the implementation and management of the '[R]emediation [P]lan' identified within [the] Remediation Plan Schedule endorsement of the [RCC policy]" as provided for in Endorsement 001. *Id.* at 145. Fourth, "any 'remediation costs' associated with: The approved 'Remediation Plan' . . . as defined by [the] Remedia[tion] Plan Endorsement of the [RCC policy]" defined by Endorsement 018. *Id.* at 163.

On December 19, 2008, KDHE sent a letter to Sunflower requesting that Sunflower submit a work plan "to investigate pesticide, lead based paint (LBP) contaminated soils, or other contaminants for buildings" located within certain areas of the Plant. KDHE December Letter (Doc. 206-1 at 174). The letter further states "As discussed with [Sunflower] on multiple occasions, pesticide and LBP contaminated soils outside of existing SWMU and AOC boundaries require investigation and remediation." *Id.* The letter comments that in August 2008 KDHE requested Sunflower "perform an intrusive investigation for LBP soil contamination and visually insect for pesticide application holes and other apparent contamination for buildings in and around SWMU 63," but that Sunflower declined that request. *Id.* On February 13, 2009, KDHE sent another letter to Sunflower stating that the work plan requested in the December letter was "past due." KDHE February Letter (Doc. 206-1 at 179). The February letter concludes with a second demand for a work plan.

Sunflower construed the December and February letters as a third-party claim against it for a work plan to investigate pesticides, lead based paint, and asbestos in soil. In response, Sunflower requested that ILU provide coverage for the claim. After this submission, Sunflower and ILU sent a series of letters back and forth clarifying their respective position as to insurance

coverage. Ultimately, ILU never denied Sunflower's claim, rather, it claimed Sunflower had not reported a matter that triggered the PPL policy so it could not determine whether coverage existed.

Sunflower filed a two-count lawsuit seeking declaratory judgment that the pollution conditions at issue are covered by the PPL policy and for damages for breach of contract.

At the parties' request, the Court agreed to separate the litigation into two phases (Doc. 29). The issue in Phase I was whether certain pollution conditions within particular areas of the Plant were excluded from coverage of the PPL policy. The Court found none of the endorsements to the PPL policy excluded coverage for these particular costs. *See* (Doc. 65). Phase II concerns all other issues in order to determine whether ILU has a duty to indemnify Sunflower under the PPL policy. At this juncture, Sunflower seeks partial summary judgment on four issues attacking some of ILU's coverage defenses and ILU seeks summary judgment on whether a claim was made.

## Summary Judgment Standard

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). A party who moves for summary judgment bears the burden of showing there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A court must view the facts in light most favorable to the nonmoving party and allow the nonmoving party to benefit from all reasonable inferences to be drawn from the evidence. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588-89 (1986).

5

## Applicable Law

The Court previously decided Kansas law applies in this case. *See* Order Den. Remand and Transfer (Doc. 22). Additionally, an endorsement attached to the PPL policy dictates Kansas law applies to questions relating to the interpretation of the policies. *See* (Doc. 206-1 at 151). The parties do not dispute Kansas law applies.

## Discussion

The essence of this case is ILU's refusal to provide coverage for certain pollution conditions Sunflower believes fall within the scope of the PPL policy. Sunflower maintains the PPL policy covers the pollution conditions and moves for partial summary judgment on four issues: (1) whether the PPL policy provides coverage for remediation costs in absence of a claim; (2) whether letters from KDHE to Sunflower constitute a claim; (3) whether the claim was first made within the policy period; and (4) whether Endorsements 001 and 018 exclude remediation costs for applied pesticides. ILU seeks summary judgment that no claim was made during the policy period.

Under Kansas law, an insurance policy constitutes a contract and the interpretation of a contract is a question of law. *AMCO Ins. Co. v. Beck*, 929 P.2d 162, 165 (Kan. 1996). If the relevant facts are admitted, the court may decide whether they come within the terms of the contract. *Goforth v. Franklin Life Ins. Co.*, 449 P.2d 477, 481 (Kan. 1969).

The parties agree the insurance policies at issue are unambiguous (Doc. 51) and the Court concluded the same in its Order on Phase I summary judgment (Doc. 65). When an insurance contract is unambiguous, a court may not rewrite the contract for the parties; "[i]ts function is to enforce the contract as made." *Catholic Diocese of Dodge City v. Raymer*, 840 P.2d 456, 459 (Kan. 1992). The court must take unambiguous language in its plain and ordinary sense.

*Warner v. Stover*, 153 P.3d 1245, 1247 (Kan. 2007). Thus, "[i]f the terms of the contract are clear, there is no room for rules of construction, and the intent of the parties is determined from the contract itself." *Liggatt v. Emp'rs Mut. Cas. Co.*, 46 P.3d 1120, 1125 (Kan. 2002). That is, the court must enforce an unambiguous contract according to its terms. *Am. Media, Inc. v. Home Indem. Co.*, 658 P.2d 1015, 1019 (Kan. 1983).

### I. The PPL policy provides coverage for remediation costs in absence of a claim.

First, Sunflower argues that the PPL policy provides coverage for remediation costs absent a claim. In reviewing the plain language of the insuring agreement and viewing the policy as a whole, the Court finds coverage for remediation costs does not require a claim.

Here, the insuring agreement covers three perils: (1) claims; (2) remediation costs; and (3) legal defense expenses associated with either claims or remediation costs. *See generally*, *Louisiana Generating L.L.C. v. Illinois Union Ins. Co.*, 719 F.3d 328, 334-35 (5th Cir. 2013) (analyzing a substantially similar insuring agreement and policy definitions, and finding claims and remediation costs were two bases for coverage, and that remediation costs are covered whether they are the relief sought by a claim or independent of a claim).

The issue is whether the phrase "provided the 'claim' is first made during the 'policy period'" applies to all three perils or just claims. ILU argues a claim is a prerequisite for coverage because it interprets the operative phrase as applying broadly to all three perils listed earlier in the sentence: claims, remediation costs, and associated legal defense expenses. Under this interpretation, ILU argues coverage for any peril is limited to instances where there is a claim.

Reading the insuring agreement as a whole, the Court does not agree with ILU's interpretation. First, use of the definite article "the" ties the clause "provided the 'claim'" to the

7

peril claims listed earlier in the sentence.  *See ASARCO, Inc. v. F.E.R.C.*, 777 F.2d 764, 773 (D.C. Cir. 1985) ("Use of the definite article in the last quoted sentence ('in *the* application for rehearing,' instead of 'in *an* application for rehearing') makes it plain that what is referred to is the same application for rehearing mentioned earlier in subsection (b)[.]") (emphasis in original). ILU's interpretation of the insuring agreement requires the operative phrase to read "*a* claim" meaning that remediation costs are covered provided *a* claim is first made during the policy period. The use of the definite article "the" defeats ILU's argument that the limiting phrase "provided the 'claim' is first made" applies to remediation costs.

Second, the insuring agreement lists claims and remediation costs. Claims is defined to include remediation costs. If a claim was required for coverage of remediation costs, there would be no reason to list remediation costs as a separate peril in the insuring agreement because claims-based remediation costs is included within the definition of claims. Under Kansas law, nonsensical contract interpretations are rejected as unreasonable. *See, e.g., Layne Christensen Co. v. Bro-Tech Corp.*, 836 F. Supp. 2d 1203, 1237 (D. Kan. 2011). It is nonsensical to list remediation costs separately from a claim but also require a claim for coverage of remediation costs when a claim includes remediation costs.

Third, reading the definition of claims and remediation costs together, it is clear remediation costs are not limited to only those incurred in connection with a claim. A claim is defined as "the assertion of a legal right" including government actions, suits, or other actions alleging responsibility or liability. Remediation costs is defined more broadly to include expenses required by environmental laws, or in response to a danger to public health or the environment. There is no mention of a claim within the definition of remediation costs. Also, remediation costs includes expenses required by environmental law or in response to a danger to

public health or the environment, whether or not there was an assertion of a legal right, as required to have a claim.

Reading the policy as a whole and applying the plain meaning of its terms, the Court finds that remediation costs are a basis for coverage in absence of a claim. The operative phrase limits the peril claims to only those that are first made during the policy period. In other words, under the PPL policy, remediation costs are covered and claims are covered "provided the claim is first made during the policy period." Sunflower's motion for summary judgment on this issue is granted.

## II. The KDHE Letters meet the definition of a claim under the PPL Policy.

Next, Sunflower argues that the December and February letters from KDHE (collectively the "KDHE Letters") constitute a claim, as defined by the PPL policy. Previously on summary judgment, the Court denied ILU's motion that the KDHE Letters did not assert a claim. Now the Court must decide the affirmative, whether the letters meet the definition of a claim. ILU again seeks a declaration that the KDHE Letters are not a claim.

To determine whether the KDHE Letters constitute a claim, the Court must first decide what the policy requires of a claim and then whether the KDHE Letters meet those requirements.

In determining what the policy requires for a claim, ILU argues there must be an allegation of responsibility or liability on the part of Sunflower. ILU reads the definition of claim as "the assertion of a legal right . . . alleging responsibility or liability[.]" However, the Court reads the operative portion as "the assertion of a legal right[.]" As explained by Sunflower:

> Everything after "including but not limited to" is examples of an "assertion of a legal right", but the examples are not exclusive. There is no comma between "actions" and "alleging" which would separate the "including but not limited to" clause from the rest of
9

>   the sentence. Thus, the "alleging responsibility" clause modifies "other actions", not "assertion of a legal right", and any assertion of a legal right meets the definition, even if it does not allege responsibility or liability on the part of the "insured" for "bodily injury", "property damage", or "remediation costs".

(Doc. 206 at 14 n.1). Accordingly, the Court finds a claim need not allege responsibility or liability.[4]

Next, the Court must decide if the KDHE Letters assert a legal right. Determining whether the KDHE Letters meet the definition of a claim is a legal question for the Court. *See Goforth*, 449 P.2d at 481 (when the relevant facts are admitted, the court decides whether they come within the terms of the contract). The definition of claim gives examples of an assertion of legal right including "other actions alleging responsibility or liability" on the part of Sunflower for remediation costs arising out of pollution conditions at the Plant.

Here, KDHE alleged Sunflower was responsible to submit a work plan to investigate pesticide, lead based paint (LBP) contaminated soils, or other contaminants at the Plant. The parties don't dispute pesticide and lead based paint are pollution conditions and that costs to investigate these conditions are remediation costs. Rather, the dispute is whether KDHE's demand for a work plan is an assertion of a legal right.

ILU argues the KDHE Letters were sent in the ordinary course of the project and were not intended to assert a legal right. ILU also argues that a claim must demand money or damages or threaten legal action. ILU attaches affidavits from the authors of the KDHE Letters to support these arguments. One affidavit states "KDHE was not seeking damages," and the

---

[4] In the Court's previous Order on summary judgment, the Court found that a claim had four elements: (1) "the assertion of a legal right, including but not limited to a 'government action' . . ."; (2) an allegation of "responsibility or liability on the part of the 'insured'"; (3) "for 'bodily injury', 'property damage', or 'remediation costs'"; and (4) "arising out of 'pollution conditions' to which this insurance applies." *See* (Doc. 168 at 15). Upon reconsideration of the policy's construction of the term claim, the Court modifies its position as to the elements of a claim.

KDHE Letters "did not assert a legal right, threaten legal action, or allege that Sunflower was in violation or breach of the Consent Order." (Doc. 212-1 at 2). The affidavit further states that the KDHE Letters "required certain work that Sunflower was required to perform pursuant to the Consent Order" and "KDHE always expected Sunflower to fulfill its obligations under the Consent Order." (Doc. 212-1 at 2). ILU concludes that because the authors stated they were not asserting a legal right nor seeking damages, the letters do not constitute a claim.

The Court finds the KDHE Letters' demand for a work plan alleges a responsibility on the part of Sunflower, namely, that Sunflower was responsible to submit a work plan. Further, the work plan was to address investigating pesticides, lead-based paint, and asbestos. As defined by the policy, expenses to investigate pollution conditions are a remediation cost. Thus, the Court finds KDHE asserted a legal right when it sent the letters to Sunflower by directing Sunflower to submit a work plan to investigate for pesticides and lead based paint. Sunflower's motion for summary judgment on this issue is granted. ILU's motion for summary judgment that the letters were not a claim, is denied.

### III. A claim for applied pesticides was first made during the policy period.

Sunflower next seeks summary judgment that the claim for applied pesticides was first made during the policy period. Previously, the Court denied ILU's motion that the claim as to applied pesticides was made prior to the policy inception date. Now the Court must decide the affirmative, whether the claim was made during the policy period. ILU again seeks summary judgment that the claim for applied pesticides was made before the policy period and renews its prior arguments.

The PPL policy excludes claims made prior to the policy inception date. However, Endorsement 008 provides that pollution conditions referenced or identified in the documents

11
Case 4:15-cv-00577-DGK    Document 223    Filed 06/25/18    Page 11 of 13

listed on the Schedule of Known Conditions are deemed to be first discovered during the policy period. One document is the Pest Management Files which references applied pesticides.

ILU argues any claim for applied pesticides was made in November 2007 when KDHE sent a letter to Sunflower requesting Sunflower investigate and remediate soils. This argument overlooks the language of Endorsement 008 which states that conditions referenced in the provided list of documents are deemed first discovered during the policy period.

The Court finds a claim for applied pesticides was first made during the policy period because the applied pesticides condition is within the Pest Management files document listed in Endorsement 008 and the exclusion for known conditions states that pollution conditions referenced in Endorsement 008 are deemed first discovered during the policy period. Summary judgment on this issue is granted for Sunflower and denied for ILU.

### IV. Applied pesticides are not excluded by Endorsements 001 or 018.

Finally, Sunflower seeks summary judgment that Endorsements 001 and 018 do not exclude applied pesticides. ILU argues there is a dispute of material fact that prevents summary judgment on this issue.

Although stated slightly differently, Endorsements 001 and 018 of the PPL Policy point to Endorsement 002 of the RCC policy to exclude certain work items that are within the Remediation Plan, as defined by the RCC Policy. Previously, the Court denied ILU's motion that the RSA incorporated applied pesticides, thus excluding that pollution condition from the PPL policy through Endorsements 001 and/or 018.

The issue is whether remediation costs for a pollution condition not included within the RSA is nonetheless related to the implementation and management of the Remediation Plan, as excluded by Endorsement 001, or associated with the Remediation Plan, as excluded by

Endorsement 018. Sunflower argues that given the Court's previous ruling that applied pesticides exceed the scope of the RSA, they cannot be excluded by Endorsements 001 or 018 because they cannot be "related to" the implementation and management of the Remediation Plan or "associated with" the Remediation Plan.

ILU asserts that there is overlap between costs for applied pesticides, which is outside the scope of the RSA, and costs for other pollution conditions that are within the scope of the RSA. In other words, costs to remediate a particular area of the Plant cannot be attributed exclusively to the remediation of applied pesticides, and thus there is an issue of fact precluding summary judgment on whether those costs could be excluded by Endorsements 001 and/or 018.

The Court finds remediation costs for applied pesticides are not excluded by either Endorsement 001 or 018. First, there are no facts supporting ILU's assertion that there is a cost overlap to remediate certain areas of the Plant contaminated by both applied pesticides and another pollution condition. Second, because applied pesticides are not within the RSA, costs to remediate that pollution condition cannot be related to or associated with the Remediation Plan. Consequently, Sunflower's motion for summary judgment on this issue is granted.

## Conclusion

Plaintiff's motion for partial summary judgment (Doc. 205) is GRANTED and Defendant's motion (Doc. 211) is DENIED.

**IT IS SO ORDERED.**

Date:  June 25, 2018              /s/ Greg Kays
                                  GREG KAYS, CHIEF JUDGE
                                  UNITED STATES DISTRICT COURT